Case 4:14-cv-02323 Document 71 Filed in TXSD on 12/22/16 Page 1 of 16

United States District Court
Southern District of Texas

**ENTERED**
December 22, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| W&T ENERGY VI, LLC, *et al*, § | |
| § | |
| Plaintiffs, § | |
| VS. § | CIVIL ACTION NO. 4:14-CV-02323 |
| § | |
| DAUPHIN ISLAND GATHERING § | |
| PARTNERS, *et al.*, § | |
| § | |
| Defendants. § | |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Pending before the Court are the parties' cross motions for summary judgment. W&T Energy VI, LLC ("W&T")[1], filed an amended motion for summary judgment (Dkt. No. 58). Dauphin Island Gathering Partners and Dauphin Island Gathering System, LLC (the "defendants") responded with various motions and responses (Dkt. Nos. 60, 61, and 62). The defendants filed a motion for summary judgment (Dkt. No. 64) to which the plaintiffs responded with various motions and responses (Dkt. Nos. 59 and 63). After having carefully evaluated the motions, responses, replies, the record, the undisputed facts and the applicable law, the Court is of the opinion that the plaintiffs' amended motion for summary judgment should be GRANTED; the defendants' motion for summary judgment should be DENIED.

**II.   FACTUAL BACKGROUND**

This dispute arises out of the opposing interpretations of several agreements. More specifically, the parties disagree on the interpretation of contract language discussing applicable fees payable to both parties. The disputed agreements and years of execution are as follows: (1)

---

[1] Due to its various roles in the agreements at issue, W&T Energy VI, LLC, is at times referred to as "plaintiffs," "Operator," "W&T," one of the "Platform Owners," or one of the "Virgo Owners."

the Platform Agreement (1998); (2) the Newfield Production Handling Agreement (2009); (3) the First Amendment to the Newfield Production Handling Agreement (2011); (4) the Walter Production Handling Agreement (2009) and; (5) the First Amendment to the Walter Production Handling Agreement (2011).

W&T, along with Energy XXI GOM, LLC ("Energy XXI"), EnVen Energy Ventures, LLC ("EnVen") and Black Elk Energy Offshore Operations, LLC ("Black Elk") (W&T, Energy XXI, EnVen and Black Elk are collectively referred to as the "Platform Owners") own an offshore operating production platform in Viosca Knoll Block 823 (the "Platform"). The Platform Owners and the defendants are parties to a Platform Agreement effective August 20, 1998 (the "Platform Agreement"), with W&T, designated as the Platform Operator ("Operator"). As Operator, W&T is required to operate and maintain the Platform and the handling facilities—owned by the defendants—located on top of the Platform.[2]

The Platform Agreement represents an agreement amongst the parties to utilize the Platform and the Handling Facilities to process and handle natural gas produced by third parties ("Third Party Gas"), in addition to gas produced by the Platform Owners. It provides that the Platform Owners and the defendants would equally share the Net Operating Revenue, with regard to Third Party Gas.[3] Pursuant to the Platform Agreement, the defendants were required to adhere to the following: (1) pay Platform Owners $12,000 per month for labor costs to be furnished by the Operator associated with the operation and maintenance of the Handling Facilities and the Platform as more specifically set forth in the amendments to the Walter and

---

[2] The "Handling Facilities" are defined in the Platform Agreement to include: "Gas dehydration and condensate/oil separation facilities . . . including all valves, fittings, devices, interconnecting piping and other equipment, and any other gas dehydration and condensate/oil separation facilities that might be installed." (Dkt. No. 64, Ex. A, at 1).

[3] "Net Operating Revenue" is defined as "the gross revenue received by the defendants for handling Third Party Gas less all direct operating and maintenance costs." (Dkt. No. 64, Ex. A, at 7).

Newfield Production Handling Agreements; *See* Dkt. No. 64, Exs. E and F; (2) reimburse Platform Owners for all other costs and expenses related to the operation and maintenance of the Handling Facilities; and (3) pay Platform Owners a "per MMBtu fee" for Third Party Gas handled through the Handling Facilities to reimburse the Platform Owners for labor related costs, to be furnished by the Operator, associated with the Third Party Gas.  *See* Dkt. No. 64, Ex. A.

On January 1, 2009, the Platform Owners and the defendants entered into a Production Handling Agreement with Walter Oil & Gas Corporation ("Walter") and other third party producers (the "Walter PHA").  Walter is a third party producer who co-owned an offshore oil and gas lease.  The Walter PHA permitted Walter to lay a pipeline from its lease to the Platform so that Walter's gas could be produced at the Platform.  Under the terms of the Walter PHA, the Platform Owners are parties in their capacity as owners of the Platform and the defendants are parties in their capacity as owners of the topside facilities located on the Platform.  The Platform Owners and the defendants are collectively referred to in the Walter PHA as the "Virgo Owners."  The Walter PHA also contains provisions relating to fees payable under the Agreement.  Some of the fees to be paid under the Walter PHA include the Monthly Production Handling Fee and the Operating and Maintenance Fee.

On October 1, 2011, the Walter PHA was amended ("Amended Walter PHA").  In accordance with the terms of the Amended Walter PHA, pigging facilities were installed on the Platform for pigging operations in the Walter flowline.[4]  Walter purchased and owned the pigging facilities, while the Operator provided the operation and maintenance duties.  The Amended Walter PHA also provides for the payment of a Pigging Facility Operating Fee to be

---

[4] Pipeline pigging is a maintenance tool that ensures that the pipeline is running smoothly.  Pipeline pigs are introduced into a pipeline via a pig trap, which trap includes a launcher and receiver.

paid to the Virgo Owners to cover additional cost for the Operator to operate the pigging facilities, which is explained more fully below.

Subsequently on June 1, 2009, the Platform Owners and the defendants entered into a Production Handling Agreement with Newfield Exploration Corporation ("Newfield") and other third party producers (the "Newfield PHA").  Newfield is a third party producer who co-owned an offshore oil and gas lease.  The Newfield PHA also allowed Newfield to lay a pipeline from their lease to the Platform so that Newfield's gas could be produced at the Platform.  On August 1, 2011, the Newfield PHA was amended ("Amended Newfield PHA").  The Amended Newfield PHA detailed the installation of a gas compressor dedicated for Newfield's production.  Newfield purchased and owned the gas compressor and the Operator operated and maintained the gas compressor.  The Amended Newfield PHA also set forth the Gas Compressor Operating Fee, which is explained in further detail below.

The Walter PHA and the Newfield PHA (collectively the "PHAs"), consisting substantively of identical terms, represent implementations of the Platform Agreement for the parties to process gas produced by third-party producers in exchange for payment of certain fees.  The Operator, as representative of the Platform Owners, and the defendants each received 50% of the Monthly Production Handling Fees ("Handling Fees") for handling Walter's and Newfield's gas.  There is no dispute as to the Handling Fees.  In 2014, all third-party producers ceased production, and delivery of production to the Platform ceased.  By January of 2015, the PHAs were terminated.

On August 13, 2014, the plaintiff filed its original complaint against the defendants, seeking a declaration that it was entitled to retain 100% of the Operating and Maintenance Fee, the Pigging Facility Fee, and the Gas Compressor Operating Fee ("Disputed Fees") pursuant to

the various agreements of the parties.[5] Since October of 2009, the Disputed Fees have been paid to the Operator or its predecessor. The Disputed Fees were paid to W&T, in its capacity as Operator, and then distributed between the Platform Owners in accordance with each's ownership interest. Thereafter, on December 24, 2014, the defendants subsequently filed a counterclaim against the plaintiffs for breach of contract and declaratory relief, seeking recovery of 50% of the Disputed Fees based upon their interpretation of the same agreements.

On December 21, 2015, W&T, amended its complaint to include the other Platform Owners, namely Energy XXI, EnVen, and Black Elk, as additional plaintiffs to the suit and added a claim for breach of contract, alleging that the defendants breached the Platform Agreement.[6] The parties have now filed cross-motions for summary judgement which are ripe for adjudication.

### III. CONTENTIONS OF THE PARTIES

#### A. The Plaintiffs' Contentions

The plaintiffs contend that based on the interpretation of the Agreements they are entitled to declaratory judgment and 100% of the following fees: (1) Operating and Maintenance Fees as set forth in the Newfield PHA and Walter PHA; (2) Gas Compressor Operating Fees as set forth in the Amended Newfield PHA; and (3) Pigging Facility Operating Fees as set forth in the Amended Walter PHA. The plaintiffs argue that the Agreements at issue required them to deliver numerous services in exchange for the Disputed Fees. The plaintiffs contend that they provided those services and incurred expenses, which in turn entitles them to receive 100% of the Disputed Fees. The plaintiffs also argue that the defendants breached the Platform

---

[5] The Disputed Fees are contained in the following agreements: Platform Agreement, Newfield PHA, Amended Newfield PHA, Walter PHA, and Amended Walter PHA (collectively the "Agreements").
[6] The Court granted Energy XXI's Motion to Dismiss without prejudice. Thus, W&T, EnVen and Black Elk are the remaining plaintiffs in this matter.

Agreement by not paying invoices properly submitted to them as well as failing to provide a good faith rationale for non-payment, resulting in damages to the plaintiffs in the principal amount of $1,291,904.87, contractual interest through February 29, 2016, in the amount of $120,437.14, plus post-judgment interest and attorney's fees. Finally, the plaintiffs request summary judgment on all of the defendants' claims.

**B.     The Defendants' Contentions**

The defendants assert that they are entitled to judgment as a matter of law on all of the plaintiffs' claims. The defendants contend that the plaintiffs' interpretation of the Agreements contravene the Agreements' true meaning. The defendants argue that being defined in the PHAs as one of the "Virgo Owners," entitles them to 50% of the Disputed Fees. The defendants also argue that they are entitled to share in the revenue from payment of the Disputed Fees under the revenue-sharing provision of the Platform Agreement, which states that parties shall equally share "Net Operating Revenue" in regard to "Third Party Gas." The defendants argue that plaintiffs' mischaracterization of the Disputed Fees as an "expense" does not entitle the plaintiffs to keep 100% of said fees. Further, the defendants argue that the pigging facilities and the gas compressor were interconnected and interdependent on the defendants' Handling Facilities, which would entitle the defendants to 50% of the associated fees. The defendants further maintain that the plaintiffs breached the Agreements by neglecting to equally share this revenue with the defendants as prescribed by the Agreements. The defendants seek an award in the amount of $3,428,392.18, plus pre-judgment interest and attorney's fees, expenses, and costs. Finally, the defendants argue that the plaintiffs' breach of contract claim is premature and is subject to arbitration as set forth in the Platform Agreement.

### IV. LEGAL STANDARD AND APPLICABLE LAW

#### A. Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'" *Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed.2d 127 (1994)). It may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Instead, it "must set forth specific facts

showing the existence of a 'genuine' issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003) (citing *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether a genuine issue of material fact has been established, a reviewing court is required to construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). Nonetheless, a reviewing court is not permitted to "weigh the evidence or evaluate the credibility of witnesses." *Boudreaux*, 402 F.3d at 540 (quoting *Morris*, 144 F.3d at 380). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 – 52, (1986)).

V. **ANALYSIS AND DISCUSSION**

    A.    **Unambiguous Contracts**

Although the parties dispute essential terms of the Agreements, they do agree that the Agreements are unambiguous and should be governed by Texas case law. Under Texas law,

state law rules of contract construction will govern the interpretation of the parties' contractual agreement. *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)). "An unambiguous contract is interpreted as a matter of law." *First Nat. Bank of Jackson v. Pursue Energy Corp.*, 799 F.2d 149, 151 (5th Cir. 1986). This Court may grant summary judgment when a contract is unambiguous. *Id.* "The courts will enforce an unambiguous instrument as written; and, in the ordinary case, the writing alone will be deemed to express the intention of the parties." *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 728 (Tex. 1981). "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (citing *Nabors Completion & Prod. Servs. Co. v. Chesapeake Operating Inc.*, No. 4:13-CV-1159, 2015 WL 851961 at *2 (S.D. Tex. Feb. 26, 2015), aff'd, 648 F. App'x 393 (5th Cir. 2016)).

"When a contract is unambiguous, the court may not rely upon extrinsic evidence to contradict or vary the meaning of the explicit language of the parties' written agreement. The court presumes that every phrase of the contract has some effect. The effect of each phrase is determined by looking at the entire contract; no one phrase, sentence, or section should be isolated from its setting and considered apart from the other provisions." *CSC Credit Servs., Inc. v. Equifax Inc.*, 119 F. App'x 610, 613 (5th Cir. 2004). "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 406 (5th Cir. 2006).

### B. Operating and Maintenance Fee

As stated above, the parties agree that the language of the Agreements is clear and unambiguous. It is apparent, however, that the parties do not agree on how that language should be interpreted. The defendants believe that they are entitled to 50% of the Operating and Maintenance Fees, while the plaintiffs believe that they are entitled to 100% of the Operating and Maintenance Fees. The relevant provision of the PHAs is found in Section 7.4 entitled, "Operating and Normal/Routine Maintenance Expenses." Section 7.4 reads as follows:

> Except for any specific charges allowed by this Agreement, VK 821 Producer shall pay a flat rate, as adjusted in Article 7.2(b), of $30,000 per month for Virgo Platform monthly operating and Normal/Routine Maintenance expenses for handling and processing production ("Operating and Maintenance Fee").

(Dkt. No. 64, Ex. C, at 34).

The PHAs define "Normal/Routine Maintenance" as follows:

> **"Normal/Routine Maintenance"** shall mean as consistent with the practices of a reasonably prudent operator by [Newfield/Walter] and the Virgo Operator the following activities: (i) regularly scheduled maintenance, inspection, testing and calibration as recommended by equipment manufacturers or as required by regulatory agencies or (ii) periodic corrective maintenance and routine repairs that are standard or typical for such equipment utilized by the oil and gas industry in an offshore operating environment . . . .

(Dkt. No. 64, Ex. C, at 7).

The drafters of Section 7.4 clearly intended that any fees paid under this provision should be used on the "monthly operating and Normal/Routine Maintenance expenses . . ." of the Platform. In an effort to clearly define the fee, the drafters named the monthly fee "Operating and Maintenance Fee," which only serves to clarify their position. The drafters of the Agreement even went so far as to define "Normal/Routine Maintenance," to specify exactly how the monthly fee should be used. As the Operator, the plaintiffs were responsible for the daily operation and maintenance of the Platform. The plaintiffs operated and maintained all of

Newfield's and Walter's equipment related to the Platform.  More specifically, the plaintiffs operated Newfield's and Walter's well testing, blowdown operations and system valves.  The plaintiffs were not only responsible for managing the personnel on the Platform, but were also responsible for scheduling travel arrangements for each person traveling to and from the Platform.  It is undisputed that the plaintiffs incurred expenses in the process of conducting the daily operation and maintenance of the Platform.  It is also apparent that the plaintiffs would not have freely undertaken the operating and routine maintenance chores of the Platform except under the terms of an agreement.  Therefore, it follows that the Operating and Maintenance Fee was intended for the operation and maintenance of the Platform.

The defendants contend, however, that being defined in the PHAs as one of the "Virgo Owners," qualifies them to receive 50% of the Disputed Fees.  This argument is unavailing because it constrains the Court's consideration of the Agreements.  Although the words "Virgo Owners" are included in the preamble language, that inclusion, by itself, does not define the relationship between the plaintiffs and the defendants.  The relationship is defined by the Platform Agreement.  The Platform Agreement provides that the defendants and the plaintiffs are to equally share the Net Operating Revenue derived from third party gas production.

Moreover, the fact that the language of Section 7.4 of the PHAs does not state that it is payable to the Virgo Owners serves to further undermine the defendants' claim for a 50% entitlement to the Disputed Fees.  Specifically, Section 7.4 provides that it is intended to cover "monthly operating and Normal/Routine Maintenance expenses."  It is clear that drafters of the PHAs did not intend for the monthly payments to be disbursed amongst the parties as revenue.  Specifically, the parties intended for the fees to be used for:  "(i) regularly scheduled maintenance, inspection, testing and calibration as recommended by equipment manufacturers or

as required by regulatory agencies or (ii) periodic corrective maintenance and routine repairs that are standard or typical for such equipment utilized by the oil and gas industry in an offshore operating environment . . . ."  (Dkt. No. 64, Ex. C, at 7).  Thus, the Court finds that the defendants' status as a "Virgo Owner" does not entitle them to share in the Disputed Fees.

The defendants further contend that they are entitled to share in the revenue from payment of the Disputed Fees under the revenue-sharing provision contained in Section 6.5 of the Platform Agreement.  The defendants maintain that Section 6.5 entitles them to equally share in any revenue derived from Third Party Gas.  The plain language of Section 6.5 does not support this position.  The relevant language of Section 6.5 provides as follows:

> To the extent that the Handling Facilities handle gas other than that produced by the Platform Owners or from wells drilled from the Platform ("**Third Party Gas**"), DIGP and Platform Owners shall share the Net Operating Revenue associated with Third Party Gas equally, with DIGP receiving fifty percent (50%) of the Net Operating Revenue and Platform Owners receiving fifty percent (50%) of the Net Operating Revenue; . . . "**Net Operating Revenue**" shall mean the gross revenue received by DIGP for handling such Third Party Gas less all direct operating and maintenance costs associated with the handling of such Third Party Gas, excepting the one cent ($0.01) per MMBtu fee set out in Section 6.6 . . . DIGP and Platform Operator shall mutually agree as to rates charged to third parties for Handling Services.

(Dkt. No. 64, Ex. A, at 7).

Section 6.5 of the Platform Agreement explains how revenue derived through the "handling" of Third Party Gas will be dispersed.  It does not mention the Disputed Fees, but merely explains how revenue is shared when the parties "handle" Third Party Gas.  Thus, the defendants are entitled to share only in revenue from Third Party Gas that is processed by the defendants' Handling Facilities.  There is no dispute that those revenues were split equally between the parties, less any direct operating or maintenance costs.  Therefore, there is no issue

concerning revenues derived from oil production processed at the Handling Facilities as it relates to the Platform Agreement.

### C.     Pigging Facility Operating Fee/Gas Compressor Operating Fee

In August 2011, pigging facilities were installed on the Platform to help maintain the Walter flowline.  The Amended Walter PHA delineates the responsibilities of its parties and explains the terms of the Pigging Facility Operating Fee.  The defendants contend that they are entitled to 50% of the Pigging Facility Operating Fees, contrary to the plaintiffs' view that they are entitled to 100% of the fees. The relevant portions of the Amended Walter PHA state the following:

> In the event that VK 821 installs Pigging Facilities for pigging operations for its production VK 821 on the Virgo Platform, then VK 821 Producer shall pay the Virgo Owners a Pigging Facility operating fee of $26,000 per month for the VK 821 Producer Pigging Facilities **("Pigging Facility Operating Fee")**. The Parties agree that the Pigging Facility Operating Fee is in additions to the fees described in Article 7 of the PHA and covers only those facilities and operations stated herein.
>
> The Pigging Facility Operating Fee shall cover the additional cost for Virgo Operator to operate the Pigging Facilities which includes but is not limited to, Normal/Routine Maintenance and assistance to VK 821 Producer Operator for the operation of the Pigging Facilities, including monitoring and reporting of the operating parameters, and required regulatory testing, as necessary.

(Dkt. No. 64, Ex. E, at 2-3).

Similarly, Newfield PHA was amended in August 2011, to install a gas compressor on the Platform for the compression of gas.  Although the Amended Newfield PHA clearly defines the terms of the Gas Compressor Operating Fee, the defendants contend that they are entitled to 50% of the Gas Compressor Operating Fees.  The relevant portion of the amendment provides:

> In the event that VK 1003 Producer installs a gas compressor on the Virgo Platform for the compression of gas produced from VK 1003, then VK 1003 Producer shall pay the Virgo Owners a Gas Compressor Operating Fee of $50,000 per month for the VK 1003 Producer gas compressor ("**Gas Compressor**

> ***Operating Fee***"). The Parties agree that the Gas Compressor Operating Fee is in addition to the Operating and Maintenance Fee described in paragraph 7.4.
>
> The Gas Compressor Operating Fee shall cover the additional cost for the Virgo Operator to operate the gas compressor and shall include the following:
>
> (a) Normal/Routine operation of the gas compressor including monitoring, reporting of the operating parameters, required regulatory testing, routine start up and shut down of the compressor as necessary.
>
> (b) Transportation of 3rd party maintenance personnel for maintenance of the gas compressor up to six (6) trips per year.

(Dkt. No. 64, Ex. F, at 3).

The Amended Newfield PHA, too, is written to "cover the additional costs for the Operator to operate" the gas compressor and pigging facilities, respectively.  As the Virgo Operator, the plaintiffs shouldered all of the maintenance and operational responsibilities, including all costs associated with the maintenance and operation of the gas compressor and the pigging facilities.  The PHAs clearly state the parties' intentions as they relate to the additional fees.  Duties such as monitoring and reporting on the operation of the installed facilities were a major focus of the PHAs.  Thus, the Court determines that the plaintiffs are entitled to receive 100% of both the Pigging Facility Fees and the Gas Compressor Operating Fees, as the fees were intended to cover operation and maintenance of the gas compressor and pigging facilities, respectively.

### D. Breach of Contract Claims

Both parties filed cross-claims alleging breach of contract.  The plaintiffs claim the defendants breached Section 8.1 of the Platform Agreement.  The defendants contend that the plaintiffs breached the Platform Agreement as well as the PHAs.  The Court now examines the language of the disputed portions of the Platform Agreement utilizing the same construction principles that the Court identified earlier.

Pursuant to Section 8.1 of the Platform Agreement, the defendants are required to pay invoices submitted by the plaintiffs within 15 days of receipt, except for amounts that are disputed in "good faith."  The defendants do not dispute that the plaintiffs performed the contracted services and submitted the proper invoices to the defendants for payment.  However, the plaintiffs claim the defendants failed to pay properly submitted invoices and never provided a "good faith" reason for nonpayment.  The defendants counter that the alleged breach is premature and a genuine dispute exists as to the amount owed.  Therefore, the defendants contend that they may withhold payments on any disputed amounts.  They further argue that the plaintiffs' breach of contract claim is subject to binding arbitration.

"To determine whether the parties agreed to arbitrate a dispute, the district court considers: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of the arbitration agreement." *Armstrong v. Assocs. Intern. Holdings Corp.,* 242 Fed. Appx. 955, 957 (5th Cir. 2007).  The plaintiffs do not challenge the validity of the arbitration clause; therefore, the Court must look to the second prong of the test, and determine whether the dispute falls within the scope of the agreement.  "Although the Court must not consider the merits of the Grievance, it must make a reasonable inquiry into the character of the Grievance to determine whether it comes within the scope of the Parties' arbitration agreement."  *Pritchard Indus. Sw., Inc. v. Serv. Employees Int'l Union Local 5*, No. CIV. A. H-09-931, 2010 WL 376316, at *3 (S.D. Tex. Jan. 26, 2010).

Either party may invoke the arbitration provisions of the Platform Agreement whether made before or after the commencement of any legal proceeding.  The plaintiffs' allegation that the defendants neither paid properly submitted invoices nor provided the requisite justification for such nonpayment, is a valid and undisputed claim because the defendants have not proffered

or established a valid basis for withholding payment. Although the defendants counter that a genuine dispute exists as to the amount it owes the plaintiffs, the evidence fails to establish that claim. The sole contract dispute is what amount of revenue is due the plaintiffs under the terms of the Platform Agreement. Therefore, the Court determines that the issue of the amount(s) owed by the defendant is not an arbitrable dispute.

## VI. Conclusion

Based on the foregoing analysis and discussion, the Court finds that the plaintiffs' motion for summary judgment should be **GRANTED**. The defendants' motion for summary judgment is **DENIED** in its entirety.

It is so **ORDERED**.

SIGNED on this 22nd day of December, 2016.

_____
Kenneth M. Hoyt
United States District Judge